ATTORNEYS FOR APPELLANT
Edward R. Ruiz
Plymouth, Indiana

Eric K. Koselke
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
Gregory F. Zoeller
Attorney General of Indiana

Ian McLean
Deputy Attorney General
Indianapolis, Indiana

# In the
# Indiana Supreme Court



FILED
May 20 2015, 9:39 am

CLERK
of the supreme court,
court of appeals and
tax court

No. 25S00-1310-LW-713

ROY BELL,

*Appellant (Defendant below),*

v.

STATE OF INDIANA,

*Appellee (Plaintiff below).*

Appeal from the Fulton Superior Court, No. 25D01-1111-MR-755
The Honorable Wayne E. Steele, Judge

On Direct Appeal

**May 20, 2015**

**Rucker, Justice.**

Twenty-four-year-old Roy E. Bell was charged in a multi-count information with murder, felony murder, burglary, robbery, and criminal confinement. The State also sought life imprisonment without parole. After a bench trial Bell was found guilty as charged, and the trial court sentenced him to life imprisonment for the murder conviction. In addition the trial court sentenced Bell to a term of years for the burglary and robbery convictions. Bell now appeals challenging the sufficiency of the evidence supporting his murder conviction. We affirm the judgment of the trial court.

## Facts and Procedural History

On November 22, 2011, Timothy and Deborah Richardson returned home from work to discover the lifeless body of Deborah's eighty-one-year-old mother Wilma Upsall who had lived with the couple for only a few months. Upsall was bound to a chair with a towel and telephone cord. She died from multiple gunshot wounds "either of which could [have been] fatal." Ex. 175 at 3. Timothy soon discovered that the bedroom which he and his wife shared had been ransacked. He testified, "[e]verything was dumped out of the drawers . . . everything was just a mess. All my guns were missing, and I noticed the jewelry box was empty." Tr. at 184. The remainder of the house was largely undisturbed. Apparently, entry to the home had been gained by using a rock to smash a sliding glass door that opened onto the patio. Cohorts William Scroggs, Jason Miller, and Roy Bell quickly emerged as persons of interest. The following day, the Indiana State Police conducted surveillance on a home where they believed the men could be found. When three men left the house traveling in an El Camino-type vehicle, police followed and eventually tried to stop the vehicle for a traffic violation. The men led police on a high-speed chase through multiple counties. Eventually, the vehicle crashed in a ditch. Miller was arrested at the scene—the other two men fled. Along the path of the chase and at the crash site police recovered, among other things, a bag of jewelry, an extension cord, and several firearms that Timothy later identified as having been taken from his home.

The next day—two days after the killing—State Police executed a search warrant for the home the three men had been observed leaving. Michelle Rzepczynski lived there with her parents and daughters. Rzepczynski had dated Bell's father until approximately three months

earlier. She knew Bell and considered him as one of her own children. Rzepczynski told police that Bell had come to the house in the early morning hours of November 23 and told her, "I've been here with you all f***in' day; and if you say anything different, I'll kill you." Ex. 178A at 15-16. When Rzepczynski pressed Bell to tell her what was wrong, he said, "I just f***in' murdered someone, okay, bitch?" "I put two (2) clips in that bitch." Id. at 17, 22. Rzepczynski said Bell told her he killed Upsall because his mask came off while he was carrying items and Upsall recognized him. Id. at 13-14. DNA testing of a later recovered homemade black mask revealed "Mr. Scroggs and Mr. Bell could not be excluded as having deposited the DNA on the mask." Tr. at 133.

Bell was taken into custody on November 24. After waiving his Miranda[1] rights Bell gave a statement to the police. According to Bell, he, Miller, and Scroggs had been getting high on pills when they wanted to go do "other stuff." Ex. 179A at 32. In order to get money for what they wanted the trio went to a couple of abandoned houses, "[j]ust lookin' for junk, scrap, somethin' like that" to sell. Id. at 33-34. After coming up empty at the other houses, they decided to target the Richardsons' home because, according to Bell, "a buddy of mine knew that there might be some guns." Id. at 35. Bell contended that Miller broke the latch on the back window to gain access to the home. Id. at 37. When one the officers asked if Bell had entered "through that window," Bell replied, "[w]ell, it was like . . . it's like a door really, sliding door window . . . ." Id. at 38. Bell explained the door was broken by throwing a "brick." Id. He acknowledged that after entering, the trio found a woman sitting on a couch whom they tied up. Bell admitted that he and his cohorts were looking for anything that would be worth money, and that they found some firearms in the house. When specifically asked, "[a]t some point this woman dies . . . did you do it?" Bell replied "[n]o." Id. at 41.

On November 28, 2011, the State charged Bell with Count I murder; Count II murder in the perpetration of burglary; Count III murder in the perpetration of robbery; Count IV burglary, as a Class A felony; and Count V robbery, as a Class A felony. On December 8, 2011, the State also charged Bell with Count VI confinement, as a Class D felony. Thereafter the State sought the death penalty alleging three statutory aggravating circumstances: intentional killing while

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

committing or attempting to commit burglary, <u>see</u> Ind. Code § 35-50-2-9(b)(1)(B) (2011); intentional killing while committing or attempting to commit robbery, <u>see</u> I.C. § 35-50-2-9(b)(1)(G) (2011); and the victim was the victim of the offense of Criminal Confinement committed by the defendant, <u>see</u> I.C. § 35-50-2-9(b)(13)(B) (2011).

On May 21, 2013, Bell and the State filed a document titled "Trial Stipulation and Agreement and Sentencing Agreement." App. at 158. In essence and in pertinent part the agreement provided that the State would withdraw its request for the death penalty and instead request a sentence of life without parole; Bell would agree to waive trial by jury; he also agreed that if convicted of murder he would receive a sentence of life without parole.[2] The parties also

---

[2] Specifically the document provides:

> The Defendant, the attorneys for the Defendant, and the Prosecuting Attorney, hereby submit to the Court their Trial Stipulation and Agreement and Sentencing Agreement, the terms of which are as follows:
> 1. The Defendant shall waive trial by jury and trial will be to the judge. The State shall also waive its right to trial by jury.
> 2. The State shall withdraw its request for the imposition of a sentence of death and shall file a separate request for imposition of life imprisonment without possibility of parole alleging the same aggravating circumstances as originally alleged in its request for the death penalty.
> 3. If the Defendant is convicted of any Count of the Information alleging the offense of murder the parties agree that he shall receive a sentence of life imprisonment without possibility of parole. For this purpose the Defendant agrees and stipulates in advance that the alleged aggravating factors are valid and are true beyond a reasonable doubt and that they outweigh any possible mitigating circumstances beyond a reasonable doubt. The Defendant hereby waives any right to have a jury determine the existence of aggravating or mitigating factors for any sentencing purpose, or a jury determination of any sentencing issue. In addition, the Defendant waives any right to appellate review of the sentence of life imprisonment without possibility of parole and waives the right to seek to modify that sentence under I.C. 35-38-1-17 or any other applicable modification of sentence or placement statute or procedure available now or in the future.
> 4. If the Defendant is convicted of any other alleged offense there is no agreement as to the sentence or sentences to be imposed and sentencing shall be left to the Court for those offenses. The Defendant waives his right to appellate review of the appropriateness of any such sentence under Appellate Rule 7(B) or a similar future rule.
> 5. The Defendant's waiver of various rights he may have as set forth above is done with full knowledge and understanding of those rights and is done in consideration of the State withdrawing its request for imposition of the death penalty.
> 6. The Defendant acknowledges that he is satisfied with defense counsels' representation and competency in this matter, and that the Defendant believes this agreement to be in the Defendant's best interest.

entered a separate agreement stipulating to the admission of certain evidence at trial including Bell's statement to police as well as the transcribed interview of Michelle Rzepczynski. App. at 160-61. Under terms of the agreements, the case was tried to the bench on August 27, 2013. After the State rested Bell also rested without presenting evidence. The trial court found Bell guilty as charged. On September 16, 2013, the trial court entered judgment of conviction for Count I murder; Count IV burglary, as a Class B felony; and Count V robbery, as a Class C felony.[3] The trial court sentenced Bell to life without parole for murder, twenty years for burglary, and eight years for robbery, all to be served consecutively. Pursuant to Indiana Appellate Rule 4(A)(1)(a) this Court has mandatory and exclusive jurisdiction over this appeal.

**Discussion**

Indiana Code section 35-42-1-1 provides in relevant part: "A person who . . . knowingly or intentionally kills another human being . . . commits murder, a felony." "A person is responsible for a criminal offense if he knowingly or intentionally aids, induces, or causes another person to commit the offense." Lowery v. State, 547 N.E.2d 1046, 1052 (Ind. 1989). In this appeal Bell's sole claim is that the evidence is not sufficient to sustain his murder conviction. Our standard of review for sufficiency of the evidence is well-settled. We do not reweigh the evidence or assess the credibility of witnesses in reviewing a sufficiency of the evidence claim. Ferrell v. State, 746 N.E.2d 48, 50 (Ind. 2001). "[W]e look to the evidence and reasonable inferences drawn therefrom that support the verdict and will affirm the conviction if there is probative evidence from which a reasonable [fact-finder] could have found the defendant guilty beyond a reasonable doubt." Id.

Bell's two-page argument challenging the sufficiency of the evidence may be summed up as follows: (i) there was no physical evidence linking Bell to the killing; (ii) Bell's statement to police was unreliable; and (iii) Rzepcynski's statement to police was likewise unreliable. See Br.

---

App. at 158-59.

[3] Because of double jeopardy concerns the trial court entered judgment of conviction on Count IV as a Class B felony rather than a Class A felony and Count V as a Class C felony rather than a Class A felony. Also due to double jeopardy concerns the trial court merged Counts II and III with Count I; and merged Count VI with Count V.

5

of Appellant at 10-11. As for the first proposition Bell is simply mistaken. DNA testing of a homemade black mask apparently recovered along the path of the high-speed chase demonstrated the presence of a DNA mixture from which Bell could not be excluded as a possible contributor. See Tr. at 133. This evidence is significant in that according to Rzepcynski, Bell told her he was wearing a mask that fell from his face while removing items from the Richardson home. With respect to Bell's second and third propositions, we make the following observations. First, at trial Bell did not challenge the statements he now contends are unreliable. In fact he expressly stipulated that certain "items shall be admitted into evidence" at trial including "[t]he transcribed statement of Michelle Rzepcyynski taken on or about November 24, 2011" and "[t]he transcribed statement of Roy Bell, taken on or about November 25, 2011." App. at 160. Thus to the extent Bell contends his own statement was involuntary or otherwise inadmissible, this claim is waived. See Wright v. State, 828 N.E.2d 904, 907 (Ind. 2005) ("[A] party may not take advantage of an error that she commits, invites, or which is the natural consequence of her own neglect or misconduct.") (quotation omitted). In like fashion any claim that Rzepcynski's statement was inadmissible is likewise waived. Id. This then leaves us with the heart of Bell's argument, namely the weight and credibility that should be afforded the two statements. But, "[i]n reviewing a sufficiency of the evidence claim, we do not reweigh the evidence or assess the credibility of witnesses." Ferrell, 746 N.E.2d at 50. Rather, if the testimony believed by the trier of fact is enough to support the verdict, then the reviewing court will not disturb it. Marshall v. State, 621 N.E.2d 308, 320 (Ind. 1993). On this basis alone, Bell's argument must fail.

Nonetheless because sentences of life without parole are subject to this court's mandatory and exclusive jurisdiction, we address in more detail the substance of Bell's claims. According to Bell his statement to police was unworthy of belief because: "When Bell gave [h]is statement to police he was without counsel, had not slept the prior two days before his arrest, and was scared to death" and that "Bell was threatened with the death penalty and life without parole." Br. of Appellant at 10. First, the record shows that before questioning, police advised Bell of his Miranda rights both orally and in writing. Ex. 179A at 12-13, 19-22, 28. Bell acknowledged his rights—including the right to counsel—and waived those rights and spoke to police. The fact that he did so "without counsel" was a decision of Bell's own choosing. Concerning his alleged

6

lack of sleep and being scared to death, the video recording paints a different picture. From our view, Bell appears to be alert and responsive in his interactions with the officers. See Ex. 179 at 15:53-58; 16:05-06. In like fashion Bell's demeanor on the video recording was visible to the trial judge who was in the best position to gauge the reliability of Bell's statement. As for an alleged "threat" we disagree with Bell's characterization of the evidence. The record shows that during questioning one of the officers told Bell: "You know, murder's a capital offense. People can be put to death – or they could get life with – or they could be sentenced." Ex. 179A at 8-9 (interjection from Bell omitted). Explaining potential penalties does not constitute a "threat" that renders a confession unreliable as a matter of law. Morgan v. State, 587 N.E.2d 680, 682 (Ind. 1992); see also Madison v. State, 534 N.E.2d 702, 706 (Ind. 1989) (stating an explanation of possible penalties is not an inducement rendering a confession involuntary). Further, in Colorado v. Connelly, 479 U.S. 157 (1986), the Supreme Court explained that a defendant's mental state or condition—other than a mental state caused by police coercion—is not a factor in determining voluntariness. The factors raised by Bell—lack of counsel after waiving his right to counsel, lack of sleep, being scared—do not establish any "coercive police activity," which the Court has said is "a necessary predicate to the finding that a confession is not 'voluntary' . . . ." Id. at 167. In sum Bell's statement to police was not unreliable as a matter of law; and standing alone was sufficient to sustain his murder conviction.

Concerning Rzepcynski's statement, Bell contends it was not reliable because: (i) it was given shortly after she had been awakened in the early morning hours; (ii) Rzepcynski was an admitted drug user; (iii) she had motivation to lie about Bell's involvement in the offense because she had dated Bell's father; (iv) her statement of how Bell shot the victim was inconsistent with the physical evidence; and (v) Bell's statement to Rzepcynski was hearsay. Br. of Appellant at 11. We repeat again for emphasis that Bell stipulated the introduction of Rzepcynski's statement into evidence. Thus any claimed evidentiary error is not available for review.[4] In any event, other than making the foregoing assertions Bell cites no authority explaining how, either individually or collectively, they render Rzepcynski's statement to police unreliable as a matter of law. Instead the weight and credibility afforded her statement was a

---

[4] We observe in passing that Bell's statements to Rzepcynski offered in court were not hearsay as a matter of law. See Ind. Evid. R. 801(d)(2)(A) (2013) (providing in pertinent part: "A statement is not hearsay if . . . [t]he statement is offered against a party and is the party's own statement . . . .").

matter left to the trial court as the trier of fact.  We decline Bell's implicit invitation to reweigh the evidence.

## Conclusion

We affirm the judgment of the trial court.

Rush, C.J., and Dickson, David and Massa, JJ., concur.