## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 21 2015, 7:59 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Chris Palmer
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Chandra K. Hein
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Perry Gebhart,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | October 21, 2015<br><br>Court of Appeals Case No.<br>49A05-1501-CR-7<br><br>Appeal from the Marion Superior Court.<br>The Honorable Virginia Caudill, Judge Pro-Tempore.<br>Cause No. 49F18-1303-FD-14212 |

**Darden, Senior Judge**

# Statement of the Case

Perry Gebhart appeals his conviction and sentence after a bench trial of one count of criminal confinement[1] as a Class D felony, one count of sexual battery[2] as a Class D felony, and one count of battery[3] as a Class D felony. We affirm in part, reverse in part and remand.

# Issues

Gebhart presents the following issues for our review, which we restate as:

I.      Whether there was sufficient evidence to sustain Gebhart's convictions beyond a reasonable doubt.

II.      Whether the trial court abused its discretion in imposing Gebhart's sentence.

# Facts and Procedural History

A.B.'s grandmother and Gebhart's father were married for approximately ten years. During that time A.B.'s mother and Gebhart interacted like brother and sister and were on friendly terms even after their parents' marriage was dissolved. Because of that family dynamic, A.B. considered Gebhart to be her step-uncle.

---

[1] Ind. Code § 35-42-3-3(a) (2006).

[2] Ind. Code § 35-42-4-8(a)(1)(A) (2012).

[3] Ind. Code § 35-42-2-1 (2012).

[4] When the opportunity presented itself, Gebhart and his daughter, A., moved to a residence approximately ten minutes away from family, in particular, A.B. and her mother's residence. In 2012, Gebhart did not have a car, so he routinely walked his nine-year-old daughter to school. However, in December of 2012, when the weather was cold, A.B., who was seventeen years old at the time, offered to stop by her uncle's house to take him to pick up his daughter at her school. A.B.'s school day ended at 2:20 p.m., while A.'s school day ended at 3:40 p.m. A.B. would leave school, drive home to change clothes and eat, and would then drive to Gebhart's house to assist with transportation. When A.B. would arrive at Gebhart's house, he was always outside waiting for her.

[5] On December 18, 2012, A.B. texted Gebhart to see if he needed help picking up A. from school. He indicated that he did need her help, so A.B. went to his house. However, when A.B. arrived, Gebhart was not outside waiting for her as he had routinely done. A.B. thought that he must be running late. After a short time, Gebhart poked his head outside and asked A.B. to come inside his house. Thinking nothing of it, she went inside his house.

[6] After A.B. entered the house, Gebhart took A.B. by the wrist and led her back through the house toward his bedroom saying that he had something he wanted to show her. Gebhart did not threaten A.B. and did not use harsh language or a harsh tone when doing so. A.B. testified at trial on direct examination that she did not feel free to leave, however she also testified that she was not frightened at that time. Although the bedroom was dark, Gebhart asked A.B. what she thought of his bedroom. A.B. walked over to the bed and replied, "It's boring,

like no." Tr. p. 16. Gebhart then asked her to "feel his bed to see if it was soft." *Id.* A.B., who began to feel uncomfortable complied by touching the bed, and at that point, Gebhart pushed his forearm across her chest forcing her down on the bed. Gebhart then told A.B. to take off her jacket because he wanted to give her a massage. A.B. replied, "No. Let's just go get [A.]". *Id.* at 17. A.B. testified that at that point she was frozen and felt scared. *Id.*

[7] A.B. was no longer standing at that point having landed on the bed on her backside as Gebhart held her down with his arm. A.B. repeatedly said, "No. Let's just go get [A.]" *Id.* Gebhart asked, "What do you think I'm going to do? Attack you[?]" *Id.* Gebhart continued to restrain A.B. on the bed, refusing to let her get up. Gebhart then put his hand up A.B.'s shirt and under her bra. A.B. continued to tell him to stop, and told him that they should just go get his daughter at school. Gebhart did not listen to A.B., but instead continued to fondle her breasts under her bra. He told her, "We have twenty minutes." *Id.* "Then he put his hand down the top of [A.B.'s] pants," and touched her pubic hair, commenting that she needed to shave herself. *Id.*

[8] Gebhart continued to hold her down and fondle her body until she threatened to call her mom. A.B. tried to reach for her phone, but could not because of the way Gebhart was restraining her. He said, "What are you doing?" *Id.* at 18. When A.B. replied that she was going to call her mom, Gebhart stopped and said, "No. No. You're not. We can just go get [A.]." *Id.*

[9]     As they walked toward the living room, Gebhart sat down in a chair while A.B. sat on the couch. Gebhart pleaded with A.B. not to tell her mother what had happened. Gebhart asked, "How do I know you haven't told your mom[?]" *Id.* at 19. A.B. responded, "I haven't told her anything." *Id.* She then showed him her cell phone to prove to him that she had not called her mom. Gebhart said, "Well if you're not going to say anything then come over here and put it in my hand." *Id.* By that, Gebhart meant that he wanted A.B. to sit on his hand, which was open and his arm was outstretched toward her. A.B. refused, and as the two of them left the house, Gebhart hugged A.B., squeezed her buttocks, and told her that he loved her.

[10]    Although A.B. was upset, she did not want A. to have to walk home in the cold or suffer any consequences from Gebhart's actions. They picked A. up at school and then A.B. drove them to Kroger so that Gebhart could purchase some groceries. A.B. refused to go inside the store when asked because she wanted to call her mother.

[11]    After Gebhart and his daughter left the car to enter the store, even though she was worried that she might upset her mother who had been sick at home, A.B. called her anyway. Upon making the call, A.B. was upset and crying as she told her mother what Gebhart had done to her. A.B.'s mother had never heard A.B. sound so upset before and initially thought she must have been in a car accident. However, she learned that A.B. was upset because Gebhart had touched A.B. and that she felt "so gross." *Id.* at 51.

[12] Before Gebhart and his daughter returned to A.B.'s car, A.B. and her mother developed a plan that her mother would drive near A.B.'s location and would call A.B. During her call, A.B.'s mother would then ask A.B. for help, in order to make it appear as if A.B. had not previously called her, and then would follow A.B. as she took Gebhart and his daughter home. A.B. was still crying when she told her mother that Gebhart and his daughter had left the store and were walking toward her car. A.B.'s mother told her to calm down and act as if everything was normal so as not to tip off Gebhart about their phone conversation. A.B.'s mother hurriedly left the house with her ten-year-old twin boys who had just arrived home from school, having kicked off their shoes and taken off their coats. They left before the twins could put on shoes or coats.

[13] After Gebhart and his daughter got into the car, A.B.'s mother called her as planned and A.B. agreed to help her mother by supervising her brothers for her. When Gebhart and his daughter exited the car at his home, Gebhart said, "Don't hate me." *Id.* at 24. After A.B. assured him that she did not hate him, Gebhart said, "You know what I'm talking about. I love you. I'll see you tomorrow." *Id.* Gebhart and his daughter then went inside his house.

[14] A.B. drove to the Taco Bell parking lot, which was the meeting place she and her mother had arranged. A.B. was shaken, visibly upset, and was crying when she got out of her car, entered her mother's car, and sat there. A.B. did not tell her mother any more details because A.B.'s brothers were also in the car. Because A.B. was too upset to drive, she rode home with her mother and brothers. After arriving home, A.B.'s brothers went upstairs to play games, and

A.B. told her mother the details of what had happened. They contacted the police department shortly thereafter. After the incident, A.B. received therapy and began taking medication. She had not previously been in therapy nor had she taken medication before.

[15] The State charged Gebhart with one count of criminal confinement as a Class D felony, one count of sexual battery as a Class D felony, and one count of battery as a Class B misdemeanor. At the conclusion of Gebhart's bench trial on October 14, 2014, he was found guilty as charged. On December 11, 2014, the trial court sentenced Gebhart to three years for his conviction of criminal confinement, three years for his conviction of sexual battery, and 180 days for his conviction of battery, all to be served concurrently. The trial court awarded Gebhart 365 days of credit for time spent on electronic monitoring prior to trial. Gebhart now appeals.

## Discussion and Decision

### I. Sufficiency of the Evidence

[16] Gebhart challenges the sufficiency of the evidence to support his convictions, contending that the trial court applied a lesser standard of proof, preponderance of the evidence, instead of beyond a reasonable doubt. Before a defendant can be convicted of a criminal offense, the State must prove each element of the offense beyond a reasonable doubt. Ind. Code § 35-41-4-1(a) (1978); *Myers v. State*, 27 N.E.3d 1069, 1074-75 (Ind. 2015).

[17] On challenges to the sufficiency of the evidence, we do not reweigh the evidence or reassess the credibility of the witnesses. *Bell v. State*, 31 N.E.3d 495, 499 (Ind. 2015). We look to the evidence and reasonable inferences drawn therefrom that support the judgment. *Id.* If there is probative evidence from which a reasonable fact-finder could have found the defendant guilty beyond a reasonable doubt, we will affirm. *Id.*

[18] Gebhart contends that certain statements made by the trial court indicate that a lesser burden of proof was used. However, when the challenged statements are placed in context, it is apparent that the trial court was aware of the appropriate burden of proof. The following comments were made by the trial court, first in rendering the judgment of conviction and then during sentencing.

> All right. We are back on the record after a brief recess. I have reviewed the notes that I have taken from the witness's [sic] testimony. Also briefly reviewed a piece of the transcript. I wanted to make sure I had it correct in my mind. Let me first start by saying that in cases where you have he said, she said, if both sides are equally believable, equally credible, than [sic] you must find for the Defendant. And that's the state of the law. Additionally when we are dealing with issues of beyond a reasonable doubt, uh, that standard is extremely high. It can be compared to a, if you have a bottle of a hundred pills and one of those pills is poison, you feel certain enough that you can reach into that bottle grab a pill and take it and believe that it's not going to kill you. So it's a very high bar. With those things said, there has been some argument, quite a bit of argument regarding timeline and how close things are together and, you know, can someone have made a U-turn in three minutes versus one minute versus whatever. I will say that there is ample evidence I think for witness bias. Not an intentional bias but rather a bias of a

mother or a bias of a lover. We all see things through our own experiences and through our relationships with our loved ones. So for me it came down to ultimately where [A.B.] stood and where Mr. Gebhart stood in terms of credibility. And were they equally credible, all things considered. And I actually at this time must say that I find that [A.B.] was more credible, that is to say that Mr. Gebhart was less credible. And the reason why I say this is not because of the other witness's [sic] testifying about treatment or pain addiction, or addiction to pain medication or anything like that, but rather testimony by Mr. Gebhart. Specifically, he indicated a number of things that I found simply unbelievable. First, that the reason that he invited [A.B.] into the home was to show her this new carpet. I find that extremely unbelievable that a forty-six year old man is going to invite a seventeen year old girl into his home simply to show you carpet. And frankly on top of that, being unemployed, I questioned where he was able to recarpet his living room. But putting that aside, I find the reason for inviting her into the home to be questionable. Second, he indicated in his testimony that [A.B.B.], the mother, I hope I got that first name right, actually came and helped him pick up his daughter a couple of days, after this incident allegedly happened. And yet through Defense Counsel's questioning we established that she was furious, extremely angry, that's bias, when she learned of this event. So I find that to be unbelievable as well. There were a number of other specific instances that I also questions [sic]. They were more peripheral but I think the heart of the case is this, I do not believe you, Mr. Gebhart. I'm sorry. I do not believe you are a credible witness in this particular instance. And as a result I am finding you guilty on all three of the counts.

. . . .

All right. First I want to once again thank everyone for their statements and for argument. I will say this much, that your attorney did a hell of a job for you. And I mean that sincerely and genuinely. And here's why I'm telling you that. You talked about, you didn't know how to convince me that you were telling

the truth. And that the victim in this matter was, you know, very persuasive. Well, the truth of the matter is, sir, that up until the point you testified, I was going to find you not guilty. And the reason for that was not because I didn't believe what she was having to say, I did believe her. But the standard of proof is so very[,] very high. I observed her demeanor, I observed her face flushed, her ears turned red, she couldn't look at you, she shook. There was a lot more than just saying the words. I've heard people say all sorts of things. That doesn't mean they are true. In fact, nine times out of ten that usually means there is a little bit of truth and little bit of not truth. In this instance I believed her. I did believe her. But the fact of the matter was, uh, that I did not believe the State had actually carried its burden. And then you took the stand. And I will tell you, as I told you at the time, I didn't believe what you had to say. And it is as simple as that. Again, I observed your demeanor, I heard . . . I found the story that you provided for why she was even in your house to be unbelievable. . . .

Tr. pp. 144-182.

[19] Gebhart has not established that the trial court misapprehended the appropriate standard of review. The trial court made reference to the State's burden of proof beyond a reasonable doubt. In fact, the trial court's statements could be construed as imposing a higher not lesser burden on the State. Nonetheless, we find no error in the trial court's statements.

[20] However, in reviewing Gebhart's challenge to the sufficiency of the evidence supporting his convictions, we conclude that while there is sufficient evidence to support his convictions of sexual battery and battery, there is insufficient evidence to support his conviction of criminal confinement.

[21] In order to convict Gebhart of criminal confinement as charged, the State was required to establish beyond a reasonable doubt in pertinent part that Gebhart knowingly or intentionally confined A.B. without her consent. Ind. Code § 35-42-3-3. The term "confine" is defined by statute as substantially interfering with the liberty of a person. Ind. Code § 35-42-3-1(1977). A definition of the term "consent" is not contained in the general definitions chapter of the criminal code, *see* Ind. Code § 35-31.5-2-1, *et seq.* (2012), but has been analyzed in case law.

[22] For example, in *Winn v. State*, 748 N.E.22d 352 (Ind. 2001), a defendant was charged with criminal confinement without the victim's consent. In that case, Winn hit the victim on the head with a rifle, threatened to kill both her and her daughter, raped the victim twice, and forced her to perform oral sex. He then lay down beside the victim on the bed while armed with a rifle. The victim later got up from the bed to use the bathroom. Winn asked her where she was going, did not attempt to stop her, and fell asleep on the bed, where he was later apprehended by law enforcement. Our supreme court found that despite surplusage in the language of the charging information, the evidence, particularly the evidence of Winn's conduct prior to the confinement, was sufficient to allow a reasonable inference that the victim's obedience to Winn's command that she lie in bed with him was without her consent notwithstanding her later departure from the scene. *Id.* at 357.

[23]     Here, it is alleged that Gebhart confined A.B. without her consent when he led her down the hallway by the wrist to the bedroom. In closing argument, the State argued as follows:

> Now specifically going to the actual text of what we have charged here, he's charged with knowingly confining [A.B.]. Confinement is a substantial interference with somebody's liberty. You heard testimony today that he grabbed her by the wrist, she did not feel like she could leave. She couldn't get away and she was pulled into a bedroom. Then while she was there that's when the Sexual Battery occurred.

Tr. pp. 138-39.

[24]     Also relevant to our analysis is A.B.'s testimony, which was as follows:

Q:     So what did you do next?

A:     I went inside to see what he needed or what he wanted.

Q:     And what happened after you went into the house?

A:     When I went in there he grabbed my wrist and pulled me back to the bedroom because he said he had to show me something.

Q:     And how hard did he grab your wrist?

A:     I'm not sure how to . . .

Q:     Did it hurt when he grabbed your wrist?

A:     I mean it was tight enough to hurt, like to feel pressure. But it wasn't like tight enough to leave a bruise or anything.

Q:     Did you feel like you could get away from him at that time?

A:     No.

Q:     So what happened next?

A:     He pulled me back to the bedroom and he was like, there was no lights on and he was like, "What do you think about my bedroom?" I was like, "It's boring, like no." Then he told me to go feel his bed to see if it was soft.

Tr. pp. 15-16.

[25]  This evidence shows that arguably A.B.'s liberty was interfered with when Gebhart knowingly or intentionally "grabbed and pulled" her by the wrist and led her back to the bedroom. However, there is no evidence to allow a reasonable inference that he did so without her consent. Colloquially, the term "grabbed" can be taken to mean different things, some of which do not suggest a lack of consent.

[26]  Looking at the circumstances leading up to the alleged criminal confinement as a whole and reviewing Gebhart's overt acts, as the Supreme Court did in *Winn*, the record reflects that Gebhart, A.B.'s step-uncle, invited her into his house to show her something. Once she was inside, he took her by the wrist back toward his bedroom, an area of Gebhart's home that A.B. had not previously seen although she had been to his house before. There is no evidence that Gebhart used threats of force, or harsh language or tone before or as he led A.B. to the bedroom. A.B. did not resist, nor did she say that she did not want to go to the bedroom to see what Gebhart wished to show her. Further, there is no evidence that A.B. thought or felt that she was being confined without her consent. She did not testify about feeling frightened as he led her toward the room or feeling that anything illegal was going to happen in the room. Therefore, there is no conduct from which one could infer that her obedience to

Gebhart's invitation was anything more than that expected between older and younger family members.

[27] Unfortunately, illegal activity did occur after the two arrived there in Gebhart's bedroom. Further, the fact that Gebhart's invitation was a pretense and not normal family interaction was only discovered later. However, during the time period during which the criminal confinement was alleged to have occurred, there is no evidence to suggest that she was confined without her consent.

[28] The State relies on A.B.'s testimony at trial that she did not feel she could get away from Gebhart, but that is the nature of confinement. Here, the State alleged that Gebhart substantially interfered with A.B.'s liberty and did so without A.B.'s consent. Because there is no evidence to support this element of the charged crime, we must reverse Gebhart's conviction of criminal confinement, and remand this matter to the trial court to vacate Gebhart's conviction on this count.

## II. Pre-Trial Credit Time

[29] Gebhart also challenges the trial court's sentencing order, contending that the trial court erred by awarding him credit for only 365 days served pre-trial on home detention with GPS monitoring. Gebhart claims that the trial court abused its discretion by awarding what he describes as an arbitrary sum of credit time when he should have been awarded credit for the 639 total days he served on home detention. We agree.

[30]     Since pre-trial jail time credit is a matter of statutory right, trial courts generally do not have discretion in awarding or denying that credit. *Roberts v. State*, 998 N.E.2d 743, 747 (Ind. Ct. App. 2013). On the other hand, sentencing decisions not mandated by statute are within the discretion of the trial court. *Id.* Those decisions will be reversed only upon a showing of an abuse of discretion. *Id.* An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstance before the trial court. *Id.* Because there is no statute addressing credit for time served while on pre-trial home detention, we review the trial court's decision for an abuse of discretion. *Id.*

[31]     Our Supreme Court has made it clear that a defendant is only entitled to credit toward his sentence for pre-trial time served in prison, jail, or some other facility which imposes substantially similar restrictions upon the defendant's liberty. *Purcell v. State*, 721 N.E.2d 220, 224 n.6 (Ind. 1999). Indeed, the trial court could have declined to award any credit for time Gebhart served in pre-trial home detention, and such decision would have been within its discretion. *See id.* However, there has to be some explanation for the trial court's use of discretion in making its award.

[32]     In support of the trial court's decision, the State argues that the trial court gave a lengthy and detailed sentencing statement. The trial court did express in detail its sentencing decision in terms of the sentences imposed for the convictions. What the trial court did not do was express in detail why credit for actual time served on pre-trial home detention with electronic monitoring was

limited to 365 days instead of the entire 639 days. This is particularly problematic since Gebhart testified that he had no violations of the conditions of his pre-trial home detention.

[33] Because there is no explanation why the trial court limited credit for pre-trial home detention where the evidence reflects that Gebhart was compliant with the conditions imposed on him, we conclude that the trial court's decision is clearly against the logic and effect of the facts and circumstance before the trial court in that regard, and, thus an abuse of discretion. We reverse the trial court's decision on credit for pre-trial detention and remand the matter to the trial court for a detailed statement of the reason for whatever credit is allowed.

## Conclusion

[34] For the reasons stated above, we affirm the decision of the trial court in part, reverse in part, and remand with instructions.

[35] Affirmed in part, reversed in part and remanded.

Robb, J., and Crone, J., concur.