## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 16 2017, 8:38 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Karen Celestino-Horseman
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

Lyubov Gore
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Octavio D. Gonzalez, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff* | August 16, 2017 <br><br> Court of Appeals Case No. <br> 49A04-1701-CR-151 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable Grant W. Hawkins, Judge <br><br> Trial Court Cause No. <br> 49G05-1407-MR-35467 |

**Crone, Judge.**

## Case Summary

[1] Following a jury trial, Octavio Daniel Gonzalez appeals his conviction for murder. He asserts that the State presented insufficient evidence to support his conviction and that the trial court committed fundamental error in admitting DNA evidence. Finding the evidence sufficient and no fundamental error, we affirm.

## Facts and Procedural History

[2] Dexter Smith and Quashawnda Wagner were married with three children and lived in a single-story house in Indianapolis. Wagner's cousin introduced the couple to Gonzalez, resulting in a close friendship between Gonzalez and Smith. Gonzalez was such a frequent visitor at Smith's house that "[h]e was over [at the house] ninety-eight percent of the time." Tr. at 30. On July 11, 2014, Wagner, Smith, and Gonzalez rented a car and drove to Kentucky and back while the children stayed with Smith's mother in Indianapolis. The next morning, at approximately 6:00 a.m., Wagner left her house and drove the rental car to her mother-in-law's residence. Only Smith and Gonzalez, who was sleeping on a sofa in the sun room, remained in the house.

[3] At approximately 9:30 a.m., Smith used Gonzalez's cell phone to call Wagner and said that he was looking for a pair of his earrings. Wagner looked for the earrings in the rental car but did not find them. About twenty to thirty minutes later, Wagner called Smith at Gonzalez's cell phone number and Smith's three cell phone numbers, but he did not answer. She decided to return to their

house, and Wagner's mother-in-law followed in her vehicle. When Wagner arrived at the house, she went to the front door, which was locked, and opened it with her keys. Upon entering the house, she noticed that the house was silent and Gonzalez was no longer there. Wagner found Smith lying on the bedroom floor with a pool of blood around his head. She quickly exited the house and informed her mother-in-law of Smith's condition. Tyron Belton, the next-door neighbor, was mowing the grass when he heard Wagner's wails. Belton called 911, and shortly thereafter the police and emergency medical personnel arrived. Smith was declared dead. An autopsy determined that his death was caused by a single gunshot to the back of the head.

[4] Around 10:30 a.m., prior to Wagner's arrival, Belton had driven to a nearby gas station to purchase gas for his lawn mower. As Belton drove back to his house he recognized Gonzalez, by the haircut he had given him a few days earlier, walking on the sidewalk away from Smith's house. Belton thought this was strange because "[Gonzalez] never walked anywhere, he was always with [Smith]." *Id.* at 53. Belton did not see anyone else out walking or anyone else coming and going from Smith's house that morning.

[5] Wagner informed the police that Smith's handgun was missing from its holster on top of the bedroom dresser and that $15,000 in cash, which Wagner had seen Smith count the previous night, was also missing from Smith's sweatpants pocket. The police noticed that the back doors were closed but unlocked and that the rear security gate was open. Wagner attempted to locate Gonzalez, but her phone calls went unanswered. Wagner's cousin provided her with the

phone number of Gonzalez's mother-in-law, Shelaime Yamobi, who lived near Atlanta, Georgia. Wagner called Yamobi, without mentioning the death of her husband, and Yamobi informed her that she had not seen Gonzalez. On the same evening as Wagner's phone call, Gonzalez arrived unannounced at Yamobi's house looking to speak with his wife and see their daughter. Yamobi asked Gonzalez about the sudden visit, and he responded, "I just need to lay low for a little while. I want to spend time with them." *Id*. at 106. Gonzalez then took his wife and daughter to a hotel.

[6] The following morning Wagner called Yamobi a second time and asked her whether she had seen or spoken to Gonzalez. Wagner explained why she was calling and informed Yamobi about the death of her husband. Yamobi immediately called her daughter and drove over to the hotel. At the hotel, Yamobi told Gonzalez about Wagner's phone call, specifically, that Wagner believed that Gonzalez was responsible for Smith's death. Gonzalez responded, "[T]he less you know the better." *Id*. at 109. Gonzalez and his wife started arguing. Yamobi heard Gonzalez tell her daughter that "it was either him or me. That's all you need to know." *Id*. at 110. Yamobi told Gonzalez to stay away from them and left the hotel with her daughter and granddaughter.

[7] On July 15, 2014, Yamobi contacted the detective assigned to Smith's case and informed him of Gonzalez's whereabouts and what he had said when he was confronted. Federal marshals searched the Atlanta area for Gonzalez but were unable to find him. Gonzalez was charged with murder, murder in the commission of a robbery, level 2 felony robbery, and a firearm enhancement,

and a warrant was issued for his arrest. In March 2016, Gonzalez was apprehended in Atlanta under a false name.

[8] A two-day jury trial was held in November 2016. The jury found Gonzalez guilty of murder, and he was sentenced to a term of fifty-five years. Gonzalez now appeals.

## Discussion and Decision

## Section 1 – The State presented sufficient evidence to support Gonzalez's murder conviction.

[9] Gonzalez contends that the State failed to present sufficient evidence to support his murder conviction. The standard of review for sufficiency of the evidence is well settled. We neither reweigh the evidence nor assess the credibility of witnesses. *Bell v. State*, 31 N.E.3d 495, 499 (Ind. 2015). Rather, we look to the evidence and reasonable inferences drawn therefrom that support the conviction. *Id*. The evidence need not "overcome every reasonable hypothesis of innocence." *Drane v. State*, 867 N.E.2d 144, 147 (Ind. 2007). We will affirm if there is probative evidence from which a reasonable factfinder could have found the defendant guilty beyond a reasonable doubt. *Bell*, 31 N.E.3d at 499. In sum, the reviewing court will not disturb the conviction when the testimony believed by the trier of fact is sufficient to support it. *Id*. at 500.

[10] To convict Gonzalez of murder, the State was required to prove that he knowingly or intentionally killed Smith. Ind. Code § 35-42-1-1(1). Gonzalez argues that there was no evidence regarding the specific time of the murder and

therefore no way to positively identify him as the perpetrator.[1] He suggests that the evidence merely places him "in the vicinity" of the murder along with any number of neighbors or strangers who could have been present at the undetermined time of death. Appellant's Br. at 13.

[11] "Elements of offenses and identity may be established entirely by circumstantial evidence and the logical inferences drawn therefrom." *Holloway v. State*, 983 N.E.2d 1175, 1178 (Ind. Ct. App. 2013). Gonzalez was the only person in the house with Smith after Wagner left the house at 6:00 a.m. At 9:30 a.m., Smith called Wagner using Gonzalez's cell phone, which suggests that Gonzalez was still present in the house. Belton identified Gonzalez walking on the sidewalk away from Smith's house around 10:30 a.m. This was "strange" because Belton had never seen Gonzalez walking, much less without Smith. Tr. at 53. Smith's body was discovered around 11:00 a.m., and Belton did not see anyone else walking on the streets or coming into or out of Smith's house while he mowed the grass next door. Although the exact time of Smith's death is unknown, the short time frame in which the murder must have been committed suggests that Gonzalez alone had the opportunity to commit it.

---

[1] Gonzalez also argues that there was no forensic evidence that supported the conviction and no evidence of motive. These arguments are immaterial. Although such evidence can be helpful to prove the identity of a perpetrator, it is not essential to sustain a murder conviction. *See, e.g.*, *Ellis v. State*, 725 N.E.2d 411, 412 (Ind. 2000) (finding sufficient evidence to support murder conviction despite complete lack of forensic evidence); *Moore v. State*, 653 N.E.2d 1010, 1016 (Ind. Ct. App. 1995) ("[I]t is not necessary for the prosecution to offer evidence of motive, although it may do so."), *trans. denied*.

[12] Also, Gonzalez's actions after Smith's murder are indicative that he committed it. Gonzalez immediately stopped answering his cell phone, fled the state within a day or two of the murder, and assumed an alias while evading police for over a year and a half. Our supreme court has stated that "flight may be considered as circumstantial evidence of consciousness of guilt." *Jones v. State*, 485 N.E.2d 627, 628 (Ind. 1985).

[13] Gonzalez's comments to his mother-in-law and wife also suggest his guilt. He told Yamobi that he "need[ed] to lay low for a little while." Tr. at 106. When Yamobi confronted him with Wagner's accusation that he was responsible for Smith's death, he simply responded that "the less you know the better." *Id*. at 109. Furthermore, when his wife insisted on knowing what happened, Gonzalez defended his actions by stating that "it was either him or me. That's all you need to know." *Id*. at 110. The jury, as factfinder, could reasonably infer from these comments that Gonzalez was guilty. Gonzalez's argument is an invitation to this Court to reweigh the evidence, which we cannot do. *Bell*, 31 N.E.3d at 499. Based on the foregoing, we conclude that the State presented sufficient evidence to identify Gonzalez as the murderer.

## Section 2 – The trial court did not commit fundamental error in admitting DNA evidence.

[14] At trial, Shannin Guy, a forensic scientist at the Marion County Forensic Services Agency, testified regarding DNA samples. Specifically, Guy testified that four swabs from Smith's sweatpants pocket contained a mixture of DNA from several individuals from which Gonzalez and Smith could not be

excluded as possible contributors. More than "possible contribut[ion]" could not be established due to the lack of "exclusionary information." *Id.* at 155. Guy provided further statistical data about the significance of the analysis.[2] Gonzalez argues that the trial court erred in admitting this evidence. Notably, however, Gonzalez did not object to the admission of the testimony during trial. Thus, he has waived this issue on appeal. This is because "[a] trial court cannot be found to have erred as to an issue or argument that it never had an opportunity to consider." *Washington v. State*, 808 N.E.2d 617, 625 (Ind. 2004).

[15] Accordingly, Gonzalez asserts that the trial court committed fundamental error in admitting the DNA evidence. "The fundamental error doctrine is an exception to the general rule that the failure to object at trial constitutes procedural default precluding consideration of the issue on appeal." *Halliburton v. State*, 1 N.E.3d 670, 678 (Ind. 2013). As an exception it is "extremely narrow, and applies only when the error constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error

---

[2] Regarding the first swab, Guy testified that "[t]he DNA profile … is a mixture of at least three individuals. [Smith and Gonzalez] cannot be excluded as possible contributors to the mix sample. It is estimated that 1 in 3,000 unrelated individuals could be a contributor to the mix sample." Tr. at 145. For the second swab, "[t]he DNA profile … is a mixture of at least four individuals. [Smith and Gonzalez] cannot be excluded as possible contributors to the mix sample. It is estimated that one in forty unrelated individuals could be a contributor to the mix sample." *Id.* at 148. For the third swab, "[t]he DNA profile … is the mixture of at least three individuals. [Smith and Gonzalez] cannot be excluded as possible contributors to the mix sample. It is estimated that 1 in 1,700 unrelated individuals could be a contributor to the mix sample." *Id.* For the fourth swab, "[t]he DNA profile … is the mixture of at least three individuals. [Smith and Gonzalez] could not be excluded as possible contributors to the mix sample. It is estimated that one in seven unrelated individuals could be a contributor to the mix sample." *Id.*

denies the defendant fundamental due process." *Id.* In sum, it is available only in "egregious circumstances." *Id.*

[16] Here, the DNA evidence, albeit inconclusive, did not substantially harm Gonzalez or deny his right to due process. Significantly, at closing argument, the State conceded that Guy's testimony was inconclusive and was presented for the purpose of "[showing that DNA sampling] was done . . . [so that there] would be no speculation [on the part of the jury] …." Tr. at 212. The probative value of such testimony may be minimal, but it cannot be said to have prejudiced Gonzalez's substantial rights such that a fair trial was impossible.[3] Assuming for argument's sake that the trial court erred in admitting the DNA evidence, any error was harmless. "[A]n error of admission of evidence will not result in reversal of a conviction if the error is harmless. An error will be viewed as harmless if the probable impact of the evidence upon the jury is sufficiently minor so as not to affect a party's substantial rights." *Edmond v. State*, 790 N.E.2d 141, 144-45 (Ind. Ct. App. 2003) (citation and quotation

---

[3] Indiana Evidence Rule 401 states, "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Indiana Evidence Rule 402 states, "Irrelevant evidence is not admissible." Gonzalez asserts that because the DNA evidence was inconclusive, it was irrelevant and therefore inadmissible. The State rebuts this argument by focusing on Guy's statistical data, citing *Deloney v. State*, 938 N.E.2d 724 (Ind. Ct. App. 2010), *trans. denied* (2011). In *Deloney*, this Court held that "DNA evidence that does not constitute a match or is not accompanied by statistical data regarding the probability of a defendant's contribution to a mixed sample is not relevant … and should not be admitted." *Id.* at 730. Here, Guy did testify about the statistical data, but on cross-examination it became apparent that the statistical weight of the sample, to determine whether Gonzalez was an actual contributor, was rather tenuous. We note that the mere mention of statistical data does not automatically make such evidence relevant. *Deloney* does not stand for the proposition that *any* statistical data regarding DNA evidence suffices for the purposes of relevancy and admissibility. Rather, the statistical data must have the tendency "to make a fact more or less probable." Ind. Evidence Rule 401.

marks omitted)*, trans. denied*. Here, the State presented evidence that Gonzalez had the opportunity to commit the crime and was the last known person to be with Smith; he fled the scene and evaded authorities under a false name for over a year and a half; and his own damning statements to his mother-in-law and wife implicate his guilt. Finding no fundamental error, we affirm Gonzalez's murder conviction.

[17] Affirmed.

Baker, J., and Barnes, J., concur.