## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 10 2019, 6:58 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Dorothy Ferguson
Anderson, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Robert J. Henke
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In re the Termination of the Parent-Child Relationship of D.P. and X.P. (Minor Children) and | April 10, 2019 |
| | Court of Appeals Case No. 18A-JT-2404 |
| T.G. (Father), | |
| *Appellant-Respondent,* | Appeal from the Madison Circuit Court |
| v. | The Honorable G. George Pancol, Judge |
| Indiana Department of Child Services, | Trial Court Cause Nos. 48C02-1802-JT-19 48C02-1802-JT-20 |
| *Appellee-Petitioner.* | |

**Mathias, Judge.**

[1] T.G. ("Father") appeals the Madison Circuit Court's order terminating his parental rights to his two minor children. Father argues violations of due process and a lack of evidence to support the trial court's termination order. Concluding that Father has not established that he was denied due process and that clear and convincing evidence supports the trial court's order involuntarily terminating his parental rights, we affirm.

## Facts and Procedural History

[2] Father is the biological father of D.P., born in March 2012, and X.P., born in January 2013. Father has never been the children's primary caretaker and had not established paternity for the children until after the Child In Need of Services ("CHINS") proceedings commenced. Father had minimal interaction with D.P. and questioned whether he was X.P.'s father.

[3] The Department of Child Services ("DCS") removed the children from biological mother's care in August 2015. Mother was mentally unstable and lacked appropriate housing for the children. On the date the children were removed, Father's whereabouts were unknown. At the initial hearing held on August 12, 2015, biological mother admitted that the children were CHINS.[1]

[4] Father appeared at a dispositional hearing held on the CHINS petition on September 21, 2015. Therefore, the court held an initial hearing for Father and appointed counsel. Father waived a fact-finding hearing. Father was ordered to

---

[1] Mother's parental rights to the children were involuntarily terminated in 2018 in a separate proceeding.

complete certain services, including staying in contact with the family case manager, securing safe housing, completing a parenting assessment, and attending all scheduled visitation. Father was also ordered to establish paternity of the children. Father requested placement of the children with his parents, but biological mother objected to the request. The court ordered the children to remain in foster care, but also ordered DCS to investigate paternal grandparents as a possible placement option.

[5] A review hearing was held on March 16, 2016. The court determined that Father was compliant with the case plan but had not enhanced his ability to fulfill his parental obligations. Appellant's App. Vol. II, p. 10. DCS referred Father to Fatherhood Engagement and continued supervised visitation between Father and the children.

[6] Another review hearing was held on February 27, 2017, and Father appeared. The court determined that Father was no longer in compliance with the case plan. Father "was closed out of Fatherhood Engagement services, has not contacted DCS about placement of the children, had visitation reduced from twice a week (4 hours) to once a week (2 hours) due to his inability to provide structure, discipline, and hygiene for the children during visits, and he has made no effort to find housing suitable and sufficient to take placement of the children." *Id.* at 11. Father was also unaware of the children's welfare on the date of the hearing and continued to request placement with paternal grandparents. Father resided with his grandmother in a two-bedroom home.

[7] Paternal grandmother met with DCS prior to the February 2017 review hearing and informed DCS that Father "touched his sister," Father was removed from his parents' home after they learned of the contact between Father and his sister, and Father is only allowed in parents' "home under supervision to prevent him from hurting his siblings." *Id.* at 12. Father's parents informed DCS that they never leave Father alone with his siblings. *Id.*

[8] The trial court held a placement hearing on April 11, 2017, and Father appeared at the hearing in person and by counsel. DCS stated that paternal grandparents were "disqualified as placement . . . due to a substantiation against [Father] for sexually abusing his sisters." *Id.* at 13. The 311 report, which was admitted into evidence without objection, contained evidence that Father admitted to law enforcement officials that he inappropriately touched and engaged in sex acts with his adolescent sister. *Id.*

[9] The trial court held an additional placement hearing on July 24, 2017, at which Father appeared in person and by counsel. Father continued to request that his children be placed with paternal grandparents. The trial court determined that paternal grandparents "had not demonstrated a sufficient reason to change placement" and ordered the children to remain in the care of their foster parents. *Id.* at 14.

[10] A permanency hearing was held on September 6, 2017, at which Father appeared in person and by counsel. The court found that Father had completed

a parenting assessment, "but due to behavioral issues with the children, visitation was reduced from twice a week to once weekly[.]" *Id.*

[11] Father later obtained new counsel, who filed a motion to change placement to either Father or his parents. A placement hearing was held on January 8, 2018. The trial court denied Father's placement motion. Father never informed that DCS case manager that he wanted the children placed in his home. At the hearing, Father denied engaging in inappropriate conduct or sexual acts with his sister.

[12] A final review hearing was held in the CHINS proceedings on February 21, 2018. Father appeared at the hearing in person and by counsel. DCS presented evidence that Father was still unable to fulfill his parental obligations. But Father received a new referral for Fatherhood Engagement. And Father was still attending supervised visitation with the children once a week.

[13] On February 23, 2018, DCS filed a petition to terminate Father's rights to his children. An initial hearing was held on May 9, 2018, but Father did not appear due to lack of service. Therefore, the hearing was continued to June 5, 2018. Father's counsel entered her appearance in the termination proceedings on June 4, 2018, and Father's initial hearing was held the next day. The trial court reset the fact-finding hearing for August 13, 2018, without objection.

[14] On August 9, 2018, Father filed a motion to dismiss the petition to terminate his parental rights because no hearing was held within ninety days of the filing of the petition. DCS argued that Father had acquiesced to the hearing date by

failing to object when it was set at the initial hearing. The trial court denied Father's motion. The court then proceeded with the fact-finding hearing on August 13 and 15, 2018.

[15] On September 7, 2018, the trial court issued an order terminating Father's parental rights to D.P. and X.P. The trial court made numerous findings in support of its judgment, including that Father did not know his children's ages, birth dates, or which school they attended. Father did not request placement of the children in his home until the month before DCS filed the petition to terminate his parental rights. The court found that Father's statement denying that he told Elwood police officers that he touched his six-year-old sister in a sexual manner lacked credibility in light of the testimony of paternal grandmother who testified that Father touched his sister. Father's mother removed him from her home as a result and only allows Father in the home when he is supervised "to prevent him from hurting his siblings." *Id.* at 16. Father's stepfather also testified that he never leaves Father alone in his home with stepfather's children. The 311 Report from February 2013 also contradicts Father's denials during these termination proceedings that he confessed to law enforcement officials that he had sexually molested his sister. Ultimately, the trial court found that "the greater weight of evidence is that [Father] had sexual contact with a younger sibling." *Id.* at 17.

[16] Father moved from his grandmother's home in December 2017. However, he did not provide his new address to the case manager until June 2018. Father also missed child-family team meetings that he was ordered to attend. Father

failed to complete the Fatherhood Engagement programming. During visitations, Father struggled to care for the children's needs, particularly the children's hygiene and behavior.

[17] The children have never been placed in Father's care. D.P. avoids Father during visitation, but X.P. engages with Father. D.P. has screamed and cried to avoid visits with Father. She also picks at her skin and bullies her younger half-sibling. D.P. leaves visitation in a stupor.

[18] The visitation supervisor changed in 2018 because the case manager decided that visitation should occur in a facility as opposed to public places. The new visitation supervisor repeatedly called Father to set up visitation. Father failed to return her calls for over a month and did not visit with the children during that time. But Father regularly exercised visitation once it resumed. X.P. had minimal behavioral issues while visitation ceased for approximately six weeks. When visitation resumed, he began masturbating again several times a day.

[19] Both children have severe behavioral problems. D.P. cannot control her mood and is aggressive toward others, particularly her younger half-sibling. D.P. refuses to speak about visitation with Father. X.P. masturbates excessively and began wetting his bed again even though he has been potty-trained for over a year. On the date of fact-finding hearing, the children's behaviors were more extreme than prior behavioral problems they have exhibited throughout these proceedings. During a period of time when there was no visitation in Spring 2018, the children's behavioral problems were not evident, but the issues

resurfaced with a greater intensity than was previously observed when visitation with Father began again.

[20] The trial court concluded that based on the children's behaviors, "their escalation around visitation, and [Father's] history of sexual issues, the continuation of the parent-child relationship poses a threat to the children's well-being." *Id.* at 20. The court also found that Father "has shown very little interest in the children's lives and the improvements that have occurred over the three years of the case have come from the children becoming potty-trained by their foster parents and visits being moved into a facility alleviating concerns from earlier in the CHINS case of [Father] returning the children filthy and in soiled diapers and his inability to control the children's behavior in public." *Id.* at 23. The trial court also found that D.P. and X.P. "are entirely different children when they visit" Father, and termination of the parent-child relationship is in their best interests. *Id.*

[21] Father appeals the termination of his parental rights to both D.P. and X.P., and our court granted his motion to consolidate the cause numbers for the purposes of appeal.

## Standard of Review

[22] "We have long had a highly deferential standard of review in cases involving the termination of parental rights." *C.A. v. Ind. Dep't of Child Servs.*, 15 N.E.3d 85, 92 (Ind. Ct. App. 2014).

We neither reweigh evidence nor assess witness credibility. We consider only the evidence and reasonable inferences favorable to the trial court's judgment. Where the trial court enters findings of fact and conclusions thereon, we apply a two-tiered standard of review: we first determine whether the evidence supports the findings and then determine whether the findings support the judgment. In deference to the trial court's unique position to assess the evidence, we will set aside a judgment terminating a parent-child relationship only if it is clearly erroneous.

*Id.* at 92–93 (citations omitted). "A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment." *In re R.J.*, 829 N.E.2d 1032, 1035 (Ind. Ct. App. 2005).

## Due Process

[23] Father argues that his due process rights were violated because he was not served with the termination petition in a timely manner, the fact-finding hearing was scheduled beyond the times limits established in Indiana Code section 31-35-2-6, DCS did not comply with the notice requirements enumerated in Indiana Code section 31-35-2-6.5, and the trial court improperly limited Father's cross-examination of the family case manager. In response, DCS contends that Father was not harmed or prejudiced by any of the claimed due process violations.

[24] "When the State seeks to terminate the parent-child relationship, it must do so in a manner that meets the requirements of due process." *In re C.G.*, 954 N.E.2d 910, 917 (Ind. 2011). "Due Process has never been defined, but the phrase embodies a requirement of 'fundamental fairness.'" *Id.* (citation omitted).

"'[T]he fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner.'" *Id*. (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)).

"The process due in a termination of parental rights proceeding turns on the balancing of three factors: (1) the private interests affected by the proceeding; (2) the risk of error created by the State's chosen procedure; and (3) the countervailing governmental interest supporting use of the challenged procedure." *Id*. Because both a parent's and the State's countervailing interests are substantial, when faced with a claim of denial of due process in a termination of parental rights, we focus on the second factor, the risk of error created by the State's chosen procedure in the case. *Id*. at 918.

First, Father claims he was not served with the petition to terminate his parental rights when it was initially filed on February 23, 2018. Neither the petition nor the chronological case summary establish that DCS attempted to serve the petition on Father. At the initial hearing held on May 9, 2018, at which only DCS appeared, DCS told the trial court that it had communicated with Father and he was aware of the hearing. Tr. Vol. I, p. 5. The trial court entered a denial of the petition for Father and set the fact-finding hearing for June 5, 2018. Father appeared at the June 5th hearing without counsel. Father told the trial court he did not receive notice of the petition to terminate his parental rights. *Id.* at 11.

However, Father did not file a motion to dismiss the petition for lack of notice and has therefore waived his claim that his due process rights were violated. *See Hite v. Vanderburgh Cnty. Office of Family & Children*, 845 N.E.2d 175, 180 (Ind. Ct. App. 2006) ("It is well established that we may consider a party's constitutional claim waived when it is raised for the first time on appeal."). Furthermore, Father did receive notice of the petition before the fact-finding hearing, which was continued, and he was aware of DCS's allegations concerning the termination of his parental rights.

Next, Father filed a motion to dismiss the termination petition because the initial hearing was not held within ninety days of February 23, 2018, the date the petition was filed. Pursuant to Indiana Code section 31-35-2-6, the trial court was required to commence a hearing on the petition not more than ninety days after it was filed, in this case, May 24, 2018, and complete a hearing not more than 180 days after the petition was filed, or August 22, 2018. An initial hearing was not held until June 5, 2018, but the hearings in this case were completed on August 15, 2018, which is within the statutory timeframe. Father's motion to dismiss was filed on August 9, 2018, just four days before the fact-finding hearing commenced.

Importantly, Father appeared at the June 5, 2018 initial hearing in person and was heard in a meaningful time and manner. Father does not argue that he was harmed or that there was error in the proceedings because the initial hearing was held on June 5, 2018, which was 102 days after the petition was filed. Therefore, we cannot conclude that this procedural irregularity, a twelve-day

delay outside the proscribed ninety-day time limit, created a significant risk of error in the proceedings.

[30] Thirdly, Father argues that DCS failed to send him notices of the June 5, 2018 initial hearing and the August 13, 2018 fact-finding hearing at least ten days prior to those hearings. Indiana Code section 31-35-2-6.5 provides, in relevant part, that at least ten days before a hearing on a petition to terminate parental rights "the person or entity who filed the petition to terminate the parent-child relationship under section 4 of this chapter … shall send notice of the review to" the child's parent. *See also In re H.K.*, 971 N.E.2d 100, 103 (Ind. Ct. App. 2012) (holding that while formal service of process is not required, DCS is required to send notice of a termination hearing to the parent's last known address at least ten days before the hearing).

[31] Again, Father does not claim that these procedural irregularities caused him harm or created a significant risk of error in the proceedings. Father appeared at both hearings, was represented by counsel, testified, thoroughly cross-examined DCS's witnesses, and challenged the admission of DCS's evidence.

[32] Finally, we address Father's argument that his due process rights were violated when the trial court limited his cross-examination of the family case manager. During her cross-examination of the witness, the trial court informed counsel that she had five more minutes to conduct her examination "so make it useful and not the same questions, please." Tr. Vol. I, p. 247. Father objected to the time restriction. When the trial court ended Father's cross-examination of the

case manager seven minutes later, counsel stated, "I would like to note though for the record that I was not finished with my cross-examination of the family case manager." Tr. Vol. II, p. 7–8.

[33]  In his brief, Father argues only that, in termination proceedings, parents are "'entitled to cross-examine witnesses . . . and to introduce evidence on his or her behalf. In fact, cross examination is fundamental and essential to a fair trial.'" Appellant's Br. at 15 (citing Indiana Code § 31-32-2-3(b); *Parker v. State*, 773 N.E.2d 867, 869 (Ind. Ct. App. 2002), *trans. denied*). During his cross-examination, Father repetitively questioned the family case manager about family team meetings and services that had or had not been provided to Father.

[34]  Indiana Rule of Evidence 611(a) provides that "[t]he court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to: (1) make those procedures effective for determining the truth; (2) avoid wasting time; and (3) protect witnesses from harassment or undue embarrassment." Rule 611(a) acknowledges that the process of examining witnesses, while conducted by counsel, is subject to the control of the trial court, "'which has a wide discretion therein. Phases of the examination, such as the length and time that a witness shall be examined, and the manner and mode of [ ] examination, are under the control of, and within the discretion of, the trial court.'" *S.E. v. Ind. Dept. of Child Servs.*, 15 N.E.3d 37, (Ind. Ct. App. 2014) (quoting *Sowders v. Murray*, 151 Ind. App. 518, 525, 280 N.E.2d 630, 635 (1972), *trans. denied*); *see also Akiwumi v. Akiwumi*, 23 N.E.3d 734, 739 (Ind. Ct. App. 2014).

[35] Father does not argue that there were any specific areas of inquiry that he was unable to address on cross-examination due to the trial court's time limitation. Moreover, we agree that Father asked repetitive questions concerning the scheduling of team meetings and service referrals. The trial court also limited DCS's re-direct examination of Father because the court gave DCS "ample time with that witness[.]" Tr. Vol. I, p. 176. For these reasons, the trial court acted within its discretion when it limited the time allowed for Father to cross-examine the family case manager.

[36] None of the complained of procedural irregularities, taken as a whole, have established a risk of error that would require reversal of the trial court's judgment. Father was notified of DCS's allegations in the petition to terminate his parental rights well before the fact-finding hearings took place in August 2018. He appeared at all hearings and had the opportunity to be heard.

[37] DCS's recent struggles with due process compliance are well documented in our court's recent opinions. *See A.A. v. Ind. Dep't of Child Servs.*, 100 N.E.3d 708, 708–09 (Ind. Ct. App. 2018) (order condemning the "repeated, significant violations of due process occurring in termination of parental rights cases throughout this state" and formally admonishing "DCS for its failure to afford litigants throughout this state the due process rights they are owed"). However, the risk of error in these particular proceedings was not significant, and therefore, we conclude that there was no reversible error. *See In re T.W.*, 831 N.E.2d 1242, 1247 (Ind. Ct. App. 2005) (holding that a procedural irregularity is not automatically a violation of a parent's due process rights).

# Judicial Notice

[38] Next, Father argues that the trial court erred when it took judicial notice of the CHINS proceedings, including the transcripts of the placement hearings.[2] Specifically, Father challenges the findings in which the trial court addressed the prior allegations that Father sexually molested his six-year-old sister. Father argues that the evidence supporting this finding was only available to the termination court because the testimony was elicited during the placement hearings in the CHINS proceedings.

[39] However, Father specifically asked the trial court "to take judicial notice of all [] CHINS proceedings that occurred prior to this termination matter including placement hearings and the testimonies that have been provider [sic] there." Tr. Vol. II, p. 24. The trial court agreed to take judicial notice of those proceedings. *Id*. at 25.

[40] Father cannot now complain that the trial court erred by considering the testimony and evidence elicited during the CHINS placement hearings in determining whether his parental rights should be terminated.[3] *See Bell v. State*,

---

[2] Indiana Evidence Rule 201(b)(5) "now permits courts to take judicial notice of 'records of a court of this state,'" and that such records are presumptively sources of facts "that cannot reasonably be questioned." *See Horton v. State*, 51 N.E.3d 1154, 1160–61 (Ind. 2016).

[3] Father specifically challenges the findings that reference the testimony from the CHINS placement hearings. He argues that because the trial court inappropriately took judicial notice of the testimony, the findings are not supported by the evidence. Because Father invited the alleged error, we do not separately address his claims concerning Findings 11, 13, 25, and 26. The remainder of Father's challenges to the findings are simply a request to reweigh the evidence or a recharacterization of the evidence presented at the termination hearing.

31 N.E.3d 495, 499–500 (Ind. 2015) ( citing *Wright v. State*, 828 N.E.2d 904, 907 (Ind. 2005) ("[A] party may not take advantage of an error that she commits, invites, or which is the natural consequence of her own neglect or misconduct.") (quotation omitted)).

## Sufficient Evidence

[41] Finally, Father argues that the trial court's order terminating his parental rights is not supported by clear and convincing evidence. Father claims that he completed and participated in all court-ordered services, obtained his own home and had maintained employment, and that his interactions with the children had improved. Father also contends that DCS failed to present clear and convincing evidence that termination of his parental rights was in the children's best interests.

[42] "The purpose of terminating parental rights is not to punish the parents but, instead, to protect their children. Thus, although parental rights are of a constitutional dimension, the law provides for the termination of these rights when the parents are unable or unwilling to meet their parental responsibilities." *In re A.P.*, 882 N.E.2d 799, 805 (Ind. Ct. App. 2008) (citation omitted). "[T]ermination is intended as a last resort, available only when all other reasonable efforts have failed." *Id.*

[43] A petition for the involuntary termination of parental rights must allege in pertinent part:

>    (B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2).

[44] DCS must prove that termination is appropriate by a showing of clear and convincing evidence. *In re V.A.*, 51 N.E.3d 1140, 1144 (Ind. 2016). If the trial court finds that the allegations in a petition are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a). Finally, because Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, the trial court need only find that one of the three requirements of that subsection has been established by clear and convincing evidence. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied*.

[45] The trial court found that DCS proved both requirements enumerated in section 31-35-2-4(b)(2)(i) and (ii) by clear and convincing evidence, but we will limit our analysis to whether DCS proved that "[t]here is a reasonable probability

that the continuation of the parent-child relationship poses a threat to the well-being of the child[ren]." Ind. Code § 31-35-2-4(b)(2)(ii).

[46] To evaluate whether continuation of the parent-child relationship poses a threat to the child, a trial court "should consider a parent's habitual pattern of conduct to determine whether there is a substantial probability of future neglect or deprivation" while also judging a parent's fitness to care for his child as of the time of the termination proceedings. *In re A.P.*, 981 N.E.2d 75, 81 (Ind. Ct. App. 2012). Moreover, the trial court need not wait until a child is irreversibly influenced by a deficient lifestyle such that his physical, mental, and social growth is permanently impaired before termination of the parent-child relationship. *In re E.S.*, 762 N.E.2d 1287, 1290 (Ind. Ct. App. 2002).

[47] First, we observe that Father has never been the children's primary caretaker and had not established paternity for the children when the CHINS proceedings commenced. Moreover, Father had minimal interaction with D.P. and questioned whether he was X.P.'s father. The CHINS proceedings also pended for over two years before Father requested placement of the children in his home. Because Father did not request placement, the services that he was offered throughout the CHINS proceedings were limited.

[48] The children have behavioral issues that Father does not understand how to address. Father has shown minimal interest in the children's lives and does not understand how to care for the children. Father's visits with the children were reduced to once a week because of the children's unhealthy and extreme

behavior during the visits and Father's inability to control or address those behaviors. The children's behaviors intensify during and after visitation. And while X.P. engages with Father during visitation, D.P plays separately, avoids Father, and leaves visitation in a stupor. D.P. is unable to control her emotions, picks at her skin, and bullies her younger sibling. X.P. soils himself and masturbates several times a day.

[49]     Importantly, Father has not improved his ability to parent the children throughout these proceedings and the CHINS proceedings. The children have been in foster care for over three years and need stability that Father is unable to provide. Finally, the trial court credited the testimony of Father's mother and stepfather that Father is never left alone with his siblings because he molested his six-year-old sister.

[50]     Father also argues that DCS failed to prove that termination of his parental rights was in the children's best interests. In considering whether termination of parental rights is in the best interests of the children, the trial court is required to look beyond the factors identified by DCS and look to the totality of the evidence. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In doing so, the trial court must subordinate the interests of the parent to those of the children involved. *Id*. The trial court need not wait until the children are irreversibly harmed before terminating parental rights. *Id.* "[T]he historic inability to provide adequate housing, stability, and supervision, coupled with the current inability to provide the same, will support a finding that continuation of the parent-child relationship is contrary to the child[ren]'s

best interests." *In re A.H.*, 832 N.E.2d 563, 570 (Ind. Ct. App. 2005). The testimony of service providers may support a finding that termination is in the child[ren]'s best interests. *McBride*, 798 N.E.2d at 203.

The children are bonded to their foster parents, who are also the foster parents of the children's half-brother. They intend to adopt all three children. The court-appointed special advocate ("CASA") testified that Father has not shown much interest in the children's lives. Further, when visitation did not occur, the children's behavior was excellent, but when visitation began again the children's unhealthy and extreme behaviors resumed. Father is unable to parent the children and does not know how to control or address the children's unhealthy behaviors. Finally, both the CASA and family case manager concluded that termination of Father's parental rights was in the children's best interests. Tr. Vol. I, pp. 86, 217. For all of these reasons, the evidence is sufficient to establish that termination of Father's parental rights is in the children's best interests.

## Conclusion

Although there were procedural irregularities in these proceedings, Father has not established that those errors were significant enough to constitute a denial of due process. And the trial court's order terminating Father's parental rights is supported by clear and convincing evidence.

Affirmed.

Vaidik, C.J., and Crone, J., concur.