

**FILED**

Apr 20 2020, 8:57 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Amy D. Griner
Mishawaka, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Courtney L. Staton
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Kurtis L. Shorter,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

April 20, 2020

Court of Appeals Case No.
18A-CR-2957

Appeal from the Elkhart Superior
Court

The Honorable Stephen R.
Bowers, Judge

Trial Court Cause No.
20D02-1801-F4-2

**Bradford, Chief Judge.**

# Case Summary

[1]     On November 12, 2018, Kurtis L. Shorter was sentenced to an aggregate thirty-year sentence after he was convicted of Level 4 felony unlawful possession of a handgun by a serious violent felon ("SVF"), Class A misdemeanor possession of a synthetic drug, and Class B misdemeanor possession of marijuana and found to be a habitual offender. On appeal, he challenges the admission of certain evidence and the sufficiency of the evidence to sustain his convictions. He also argues that the trial court erred in denying his motion to dismiss the habitual-offender enhancement. We affirm.

# Facts and Procedural History

[2]     While on patrol at approximately 2:30 a.m. on October 22, 2016, Elkhart Sheriff's Department Officer Robert Smith's attention was drawn to a green Pontiac G6. While following behind the vehicle, Officer Smith observed as the vehicle "kind of veer[ed] from the south to the north" and "the tires of the vehicle, the right tires, went off the road onto the gravel portion across the white line." Tr. Vol. III p. 56. Officer Smith further observed the vehicle make a turn and, although the driver "used their turn signal," the driver did not satisfy the statutory requirement that a driver engage her turn signal two hundred feet before turning. Tr. Vol. III p. 56. Officer Smith initiated a traffic stop.

[3]     At the time of the traffic stop, there were two individuals, one female and the other male, inside the vehicle. Haven Chamberlain was driving and Shorter was sitting in the front passenger seat. Given that it was dark outside at the time of the traffic stop, Officer Smith used a flashlight to aid his ability to see the occupants of and the general vicinity in and around the vehicle.

[4]     As Officer Smith approached the vehicle, he began "smelling a chemical odor that [he] recognized to be a synthetic drug." Tr. Vol. III p. 59. The smell got "stronger as [he] got closer" to the vehicle. Tr. Vol. III p. 59. The smell "was emitting from the vehicle … through [the] driver's window." Tr. Vol. III p. 59.

[5]     After smelling the odor of a synthetic drug emanating from the vehicle, Officer Smith returned to his vehicle and "radioed for a backup unit." Tr. Vol. III p. 60. When he believed the backup unit was in the general vicinity and would arrive soon, Officer Smith approached the vehicle for a second time and requested that Chamberlain exit the vehicle. Officer Smith did not notice anything at Chamberlain's feet either of the first two times he approached the vehicle. When the assisting officer arrived a minute or two later, the assisting officer asked Shorter to step out of the vehicle and stand near where Officer Smith and Chamberlain were standing.

[6]     Due to the smell of synthetic drugs emanating from the vehicle, Officer Smith and the assisting officer searched the vehicle. Officer Smith began by searching the area around the front driver's-side door. He found "a loose greenish substance in the door panel and in the center console" that, based on his

training and experience as an officer, he believed to be synthetic drugs. Tr. Vol. III p. 68. He also found a backpack "on the driver's floorboard" that had not been present when Chamberlain exited the vehicle. Tr. Vol. III p. 68. Officer Smith unzipped the backpack and looked inside, finding "men's cologne, doo-rag, a digital scale, some more synthetic marijuana, err, I'm sorry, synthetic drug, marijuana, a Ruger .380 semi-automatic pistol … a man's belt and there was mail belonging to Kurtis Shorter in there as well." Tr. Vol. III p. 69. The mail, which included legal documents, had Shorter's name and address "printed on the envelopes and on the paperwork." Tr. Vol. III p. 69. Officer Smith field tested and weighed the marijuana, with the test confirming the presence of 24.8 grams of marijuana. Officer Smith also weighed the synthetic drugs, confirming the presence of 97.3 grams of synthetic drugs. The marijuana and synthetic drugs were stored "in a large gallon size baggie and inside that there was [sic] smaller baggies, like sandwich baggies with the substance in them." Tr. Vol. III p. 70.

[7] On October 26, 2016, the State charged Shorter with Level 5 felony possession of a handgun without a license with a prior conviction, Class A misdemeanor possession of a synthetic drug or synthetic drug lookalike substance, Class B misdemeanor possession of marijuana. Shorter subsequently filed a motion to suppress "any and all items seized from the car" during the traffic stop. Appellant's App. Vol. II p. 33. On June 12, 2017, the State amended the Class A misdemeanor carrying a handgun without a license charge to a charge of Level 4 felony SVF. The State also alleged Shorter to be a habitual offender.

On July 18, 2017, Shorter filed a motion to dismiss the habitual-offender enhancement.

[8] The trial court conducted a hearing on July 20, 2017, during which it heard argument relating to both Shorter's motion to suppress and motion to dismiss the habitual-offender enhancement. On August 24, 2017, the trial court issued a written order denying Shorter's motion to suppress. The trial court denied Shorter's motion to dismiss the habitual-offender enhancement on September 21, 2017.

[9] Following a jury trial, on January 25, 2018, the jury returned a verdict of guilty for Class A misdemeanor possession of a synthetic drug or synthetic drug lookalike substance. However, the jury was unable to reach a verdict on the remaining counts. On October 10, 2018, following a retrial, Shorter was found guilty of the remaining counts. In a bifurcated portion of the trial, the jury also found Shorter to be an SVF as alleged in the amended firearm-possession charge. In the final trifurcated portion of the trial, the jury found Shorter to be a habitual offender. On November 12, 2018, the trial court sentenced Shorter to an aggregate thirty-year sentence.

# Discussion and Decision

## I. Admission of Evidence

[10] Shorter contends that the trial court abused its discretion in admitting evidence recovered following what he claims was an unjustified traffic stop. "In cases

such as this one, where the defendant does not appeal the denial of a motion to suppress and the evidence is admitted over the defendant's objection at trial, we frame the issue as whether the trial court abused its discretion in admitting the evidence at trial." *Kyles v. State*, 888 N.E.2d 809, 812 (Ind. Ct. App. 2008).

> The admission or exclusion of evidence is entrusted to the discretion of the trial court. *Farris v. State*, 818 N.E.2d 63, 67 (Ind. Ct. App. 2004). We will reverse a trial court's decision only for an abuse of discretion. *Id*. We will consider the conflicting evidence most favorable to the trial court's ruling and any uncontested evidence favorable to the defendant. *Taylor v. State*, 891 N.E.2d 155, 158 (Ind. Ct. App. 2008). An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court or it misinterprets the law. *Id*.

*Collins v. State*, 966 N.E.2d 96, 104 (Ind. Ct. App. 2012). "Moreover, the trial court's ruling will be upheld if it is sustainable on any legal theory supported by the record, even if the trial court did not use that theory." *Rush v. State*, 881 N.E.2d 46, 50 (Ind. Ct. App. 2008) (citing *Gonser v. State*, 843 N.E.2d 947, 950 (Ind. Ct. App. 2006)).

[11] In arguing that the trial court abused its discretion in admitting the challenged evidence, Shorter claims that the challenged evidence was discovered in violation of the Fourth Amendment to the United States Constitution and Article 1, Section 11 of the Indiana Constitution. The Fourth Amendment provides as follows:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV.[1] "The fundamental purpose of the Fourth Amendment to the United States Constitution is to protect the legitimate expectations of privacy that citizens possess in their persons, their homes, and their belongings." *Taylor v. State*, 842 N.E.2d 327, 330 (Ind. 2006).

Because a traffic stop is a seizure under the Fourth Amendment, police may not initiate a stop for any conceivable reason, but must possess at least reasonable suspicion that a traffic law has been violated or that other criminal activity is taking place. *Whren v. United States*, 517 U.S. 806, 809–10, 116 S. Ct. 1769, 1772, 135 L.Ed.2d 89, 95 (1996); *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S. Ct. 1391, 1396, 59 L.Ed.2d 660, 667 (1979); *Finger v. State*, 799 N.E.2d 528, 532 (Ind. 2003). An officer's decision to stop a vehicle is valid so long as his on-the-spot evaluation reasonably suggests that lawbreaking occurred. *See State v. Washington*, 898 N.E.2d 1200, 1205 (Ind. 2008).

*Meredith v. State*, 906 N.E.2d 867, 869–70 (Ind. 2009).

[12] "Notwithstanding the textual similarity of Article 1, § 11 of the Indiana Constitution to that of the federal Fourth Amendment, Section 11 is interpreted

---

[1] Although the Fourth Amendment and Article 1, Section 11, contain a few slight variations as to word tense, punctuation, and capitalization, generally, the language provided in both the Federal and Indiana Constitutions is the same.

separately and independently from Fourth Amendment jurisprudence."
*Washington*, 898 N.E.2d at 1205–06 (citing *Mitchell v. State*, 745 N.E.2d 775, 786 (Ind. 2001)).

> The Indiana Constitution may protect searches that the federal Constitution does not. *State v. Moore*, 796 N.E.2d 764, 767 (Ind. Ct. App. 2003). Section 11 should be applied to protect people from unreasonable search and seizure. *Brown v. State*, 653 N.E.2d 77, 79 (Ind. 1995). When police conduct is challenged as violating this section, the burden is on the State to show that the search was reasonable under the totality of the circumstances. *See, e.g.,* [*State v. Quirk*, 842 N.E.2d 334, 340 (Ind. 2006)]; *State v. Bulington*, 802 N.E.2d 435, 438 (Ind. 2004). The determination of the reasonableness of a search and seizure under the Indiana Constitution turns "on a balance of: 1) the degree of concern, suspicion, or knowledge that a violation has occurred, 2) the degree of intrusion the method of search or seizure imposes on the citizen's ordinary activities, and 3) the extent of law enforcement needs." *Litchfield v. State*, 824 N.E.2d 356, 361 (Ind. 2005).

*Id.* at 1206.

## A. Traffic Stop

In challenging his convictions, Shorter argues that the traffic stop was illegal under both the Federal and Indiana Constitutions, claiming that Officer Smith lacked a valid reason for initiating the traffic stop. "[P]olice officers may stop a vehicle when they observe minor traffic violations." *Black v. State*, 621 N.E.2d 368, 370 (Ind. Ct. App. 1993). "A traffic violation, however minor, creates probable cause to stop the driver of the vehicle." *Quirk*, 842 N.E.2d at 340.

"An officer's decision to stop a vehicle is valid so long as his on-the-spot evaluation reasonably suggests that lawbreaking occurred." *Meredith*, 906 N.E.2d at 870.

[14] In this case, Officer Smith testified that he observed Chamberlain commit a traffic infraction, *i.e.*, failing to adequately signal before turning. Indiana Code section 9-21-8-25 provides that "[a] signal of intention to turn right or left shall be given continuously during not less than the last two hundred (200) feet traveled by a vehicle before turning or changing lanes." An officer's observation-of a violation of Indiana Code section 9-21-8-25 is a valid basis for a traffic stop. *See Peak v. State*, 26 N.E.3d 1010, 1015 (Ind. Ct. App. 2015); *Santana v. State*, 10 N.E.3d 76, 78 (Ind. Ct. App. 2014).

[15] Shorter does not contest the fact that failure to adequately signal constitutes a traffic violation. He merely asserts that the evidence establishes that Chamberlain signaled for the required two hundred feet and Officer Smith's mistaken belief to the contrary did not justify the stop. *See State v. Keck*, 4 N.E.3d 1180, 1184 (Ind. 2014) ("But if the officer stops a driver based on the officer's mistaken belief that the observed conduct constituted an infraction, the officer's suspicion is no longer reasonable, and the stop is therefore unsupported and impermissible.").

[16] Shorter argues that the video recording of the stop taken from Officer Smith's police vehicle proves that Chamberlain engaged her turn signal more than two hundred feet before turning. The trial court considered Shorter's argument

regarding the video recording during the suppression hearing but found that contrary to Shorter's argument, the evidence demonstrated that Officer Smith witnessed Chamberlain "activate [the vehicle's] turn signal within fewer than two hundred feet of turning left." Appellant's App. Vol. II p. 63. In making this finding, the trial court stated the following:

> Shorter … asserts also that the video of the stop shows that Chamberlain's turn signal was on before the stop was made and that it was activated within the proper distance. Furthermore, he emphasizes Officer Smith's concession that the video does not show the Pontiac veering across the fog lines and onto the gravel. Hence, Shorter argues that there was no traffic violation that supported the stop.
>
> The Court disagrees, as its review of the video of the stop and the testimony produced at the evidentiary hearing has already led it to find above that Chamberlain did not turn on her turn signal two hundred feet before turning left onto 9th Street.

Appellant's App. Vol. II pp. 65–66. In addition to the trial court's finding, Officer Smith unequivocally testified that Chamberlain failed to signal her intention to turn two hundred feet before turning. Based on Officer Smith's testimony and its review of the video, the trial court made the factual determination that Chamberlain engaged her turn signal less than two hundred feet before turning in violation of Indiana Code section 9-21-8-25. Shorter's argument to the contrary is effectively a request to reweigh the evidence, which we will not do. *Santana*, 10 N.E.3d at 78 (citing *Turner v. State*, 862 N.E.2d 695, 699 (Ind. Ct. App. 2007)). Because the evidence establishes that Officer Smith initiated a valid traffic stop after observing a violation of Indiana Code section

9-21-8-25, we conclude that the stop was justified under both the Federal and Indiana Constitutions.

## B.  Search of Vehicle

[17]   Shorter also argues that the search of the vehicle was unreasonable and therefore violated both the Federal and Indiana Constitutions because Officer Smith lacked probable cause to search the vehicle.  "Probable cause to search exists where the facts and circumstances within the knowledge of the officer making the search, based on reasonably trustworthy information, are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed." *State v. Hawkins*, 766 N.E.2d 749, 751 (Ind. Ct. App. 2002).  Facts necessary to demonstrate the existence of probable cause for a warrantless search are not materially different from those which would authorize the issuance of a warrant if presented to a magistrate.  *Young v. State*, 564 N.E.2d 968, 970 (Ind. Ct. App. 1991), *trans. denied*.  "Furthermore, the determination is to be based on the factual and practical considerations of everyday life upon which reasonable and prudent persons act." *Hawkins*, 766 N.E.2d at 751.  "The United States Supreme Court has stated that when there exists probable cause to believe that a vehicle contains evidence of a crime, a warrantless search of the vehicle does not violate the Fourth Amendment because of the existence of exigent circumstances arising out of the likely disappearance of the vehicle." *Gibson v. State*, 733 N.E.2d 945, 951–52 (Ind. Ct. App. 2000).  As long as the search is supported by probable cause, a warrantless

search of a vehicle may also include a search of a container or package found in the vehicle. *Id.* at 952.

[18] In arguing that Officer Smith lacked probable cause to search the vehicle, Shorter challenges Officer Smith's qualifications to classify the chemical odor he described as emanating from the vehicle as being the odor of burnt synthetic drugs. Specifically, he argues that smelling a chemical smell is "insufficient to establish probable cause to conduct a search because there are an unlimited number of completely legal substances that would also emit a chemical odor." Appellant's Br. p. 20. Considering the facts of this case, we cannot agree.

[19] During trial, Officer Smith detailed his experience and training as both a regular patrol officer and a member of the narcotics task force. This experience included recognizing synthetic drugs. Officer Smith explained that synthetic drugs are man-made drugs produced to have "some sort of [e]ffect on the body." Tr. Vol. III p. 48. Officer Smith further explained that synthetic drugs do not have a specific look, but "vary from different chemical make-up to different chemical make-up. Some will look like potpourri, some of them will look like marijuana, some of them will look like methamphetamine or shards of glass." Tr. Vol. III p. 49.

[20] Officer Smith further indicated that through his experience, he had become familiar with the smell of burnt synthetic drugs, stating that

> The odor is somewhat indescribable. It's a chemical odor that
> I'm able to recognize cause I've smelled it before. I describe it a
> lot like a skunk. The first time I smelled a skunk I had no idea

what it was, somebody had to tell me that it was a skunk and then from then on I've always known what the smell of a skunk is. It's kind of the same thing with the synthetic drugs.

Tr. Vol. III p. 49. Officer Smith indicated that synthetic drugs had become prevalent beginning around 2011 to 2012, and that, due to his position as a police officer, he has had experience recognizing synthetic drugs since they became prevalent in the community.

[21] As far back as 1948, the United States Supreme Court has held that

> If the presence of odors is testified to before a magistrate and he finds the affiant qualified to know the odor, and it is one sufficiently distinctive to identify a forbidden substance, this Court has never held such a basis insufficient to justify issuance of a search warrant. Indeed it might very well be found to be evidence of most persuasive character.

*Johnson v. U.S.*, 333 U.S. 10, 13 (1948). Likewise, we have concluded that when a trained and experienced police officer detects the strong and distinctive odor of a drug, such as burnt marijuana, coming from a vehicle, "the officer has probable cause to search the vehicle. That is true under both the Fourth Amendment of our federal constitution and under Article 1, Section 11 of the Indiana Constitution." *Hawkins*, 766 N.E.2d at 752.

[22] The record demonstrates that Officer Smith was both trained and experienced in identifying illegal drugs, including burnt synthetic drugs, and we agree with the trial court's determination that in light of his training and experience, Officer Smith was qualified to identify the smell of burnt synthetic drugs. We

therefore conclude that Officer Smith had probable cause to search the vehicle after noticing the smell of synthetic drugs emanating from the vehicle. His search of the vehicle was reasonable and did not violate either the Fourth Amendment or Article 1, Section 11, of the Indiana Constitution.

[23] Given that the traffic stop was justified under both the Federal and Indiana Constitutions and that Officer Smith had probable cause to search the vehicle after smelling the odor of synthetic drugs emanating from the vehicle, we conclude that the trial court did not abuse its discretion in admitting the challenged evidence.

## II. Sufficiency of the Evidence

[24] Shorter also contends that the evidence is insufficient to sustain his convictions. Our standard of review for challenges to the sufficiency of the evidence is well-settled. *Bell v. State*, 31 N.E.3d 495, 499 (Ind. 2015). "We do not reweigh the evidence or assess the credibility of witnesses in reviewing a sufficiency of the evidence claim." *Id.* Conflicting evidence is considered "in the light most favorable to the trial court's finding." *Gray v. State*, 957 N.E.2d 171, 174 (Ind. 2011). This is because the factfinder, and not the appellate court, "is obliged to determine not only whom to believe, but also what portions of conflicting testimony to believe, and is not required to believe a witness's testimony even when it is uncontradicted." *Perry v. State*, 78 N.E.3d 1, 8 (Ind. Ct. App. 2017) (internal quotation and brackets omitted). On appeal, we "look to the evidence and reasonable inferences drawn therefrom that support the verdict and will

affirm the conviction if there is probative evidence from which a reasonable fact-finder could have found the defendant guilty beyond a reasonable doubt." *Bell*, 31 N.E.3d at 499.

[25] In challenging the sufficiency of the evidence to sustain his convictions, Shorter argues that the State "did not present sufficient evidence to allow the jury to make a reasonable inference that [he] possessed either a firearm or any of the illegal substances in the vehicle." Appellant's Br. p. 11. Shorter further argues that the State's evidence is insufficient to sustain his convictions as it relies solely on speculation. We disagree.

[26] The Indiana Supreme Court has held that possession may be either actual or constructive. *Gray*, 957 N.E.2d at 174. "Actual possession occurs when a person has direct physical control over the item." *Henderson v. State*, 715 N.E.2d 833, 835 (Ind. 1999). "Constructive possession occurs when somebody has the intent and capability to maintain dominion and control over the item." *Id.* (internal quotation omitted).

> When constructive possession is asserted, the State must demonstrate the defendant's knowledge of the contraband. This knowledge may be inferred from either the exclusive dominion and control over the premise containing the contraband or, if the control is non-exclusive, evidence of additional circumstances pointing to the defendant's knowledge of the presence of the contraband.

*Woods v. State*, 471 N.E.2d 691, 694 (Ind. 1984) (internal citations omitted).

> Proof of dominion and control of contraband has been found through a variety of means: (1) incriminating statements by the defendant, (2) attempted flight or furtive gestures, (3) location of substances like drugs in settings that suggest manufacturing, (4) proximity of the contraband to the defendant, (5) location of the contraband within the defendant's plain view, and (6) the mingling of the contraband with other items owned by the defendant.

*Henderson*, 715 N.E.2d at 836 (internal citation omitted). Further, when a defendant's possession of the automobile in which drugs are found is not exclusive, "the inference of intent must be supported by additional circumstances pointing to [the defendant's] knowledge of the nature of the controlled substances and their presence." *Fassoth v. State*, 525 N.E.2d 318, 323 (Ind. 1988).

[27] In this case, the State presented evidence proving both Shorter's knowledge of, and intent and capability to exert control over, the contraband. The firearm, synthetic drugs, and marijuana were found within reach, *i.e.*, within close proximity, to where Shorter had been sitting in the vehicle. In addition, Shorter had had the opportunity to exert exclusive control over the contraband after Chamberlain, the only other person in the vehicle at the time of the traffic stop, was removed from the vehicle. The contraband was also co-mingled with other items belonging to Shorter.

[28] Officer Smith's testimony established that when he first approached the vehicle, Chamberlain was sitting in the driver's seat and Shorter was sitting in the front passenger seat. The backpack, which was eventually found on the front

floorboard on the driver's side, was not present on the driver's-side floorboard when Chamberlain was removed from the vehicle. While Officer Smith did not personally observe Shorter move the backpack, his testimony supports the reasonable inference that Shorter moved the backpack containing the contraband after Chamberlain was removed from the vehicle. Also importantly, the contraband was co-mingled with other items belonging to Shorter, *i.e.*, a men's belt, men's cologne, doo-rag, and legal documents and mail belonging to Shorter. We agree with the State's assertion that "[i]t would strain credulity to believe that Defendant was unaware of [a] firearm, synthetic drugs, and marijuana located in the same bag as his mail and court records." Appellee's Br. p. 20.

[29] We conclude that the evidence is sufficient to prove that Shorter had constructive possession of the firearm, synthetic drugs, and marijuana. Shorter's argument otherwise amounts to an invitation for this court to reweigh the evidence, which we will not do. *See Bell*, 31 N.E.3d at 499. Furthermore, to the extent that Shorter points to Chamberlain's testimony that the contraband belonged to her, the trial court, acting as the trier-of-fact, was under no obligation to believe Chamberlain and was in the best position to determine which witnesses to believe or disbelieve. *See Perry*, 78 N.E.3d at 8. As such, we will not disturb the trial court's credibility determination on appeal, *see Bell*, 31 N.E.3d at 499, and note that the conflicting evidence must be considered "in the light most favorable to the trial court's finding." *See Gray*, 957 N.E.2d at 174.

# III. Habitual-Offender Enhancement

[30] Shorter also contends that the trial court abused its discretion in denying his motion to dismiss the habitual-offender enhancement.

## A. Claims Not Raised Before the Trial Court

[31] Shorter argues that his substantial rights were violated by the State's allegedly late filing of the habitual-offender enhancement after plea negotiations broke down[2] and that a habitual-offender determination would constitute an impermissible double enhancement under Indiana Code section 35-50-2-8(e).[3] However, the State correctly asserts that Shorter "did not argue that his initial charge of Level 5 felony carrying a handgun without a license with a prior conviction would constitute a 'double enhancement' or that the State should be foreclosed from amending the charging information after plea negotiations

---

[2] Indiana Code section 35-50-1-5(e) provides that an "amendment of an indictment or information to include a habitual offender charge … must be made at least thirty (30) days before the commencement of trial." The habitual-offender enhancement was therefore timely as it was filed more than sixty days before the commencement of trial. Furthermore, we are unconvinced by Shorter's argument that the habitual-offender enhancement should be considered untimely because it was allegedly vindictively filed in retaliation for his refusal to accept a guilty plea.

[3] Indiana Code section 35-50-2-8(e) provides:
> The state may not seek to have a person sentenced as a habitual offender for a felony offense under this section if the current offense is a misdemeanor that is enhanced to a felony in the same proceeding as the habitual offender proceeding solely because the person had a prior unrelated conviction. However, a prior unrelated felony conviction may be used to support a habitual offender determination even if the sentence for the prior unrelated offense was enhanced for any reason, including an enhancement because the person had been convicted of another offense.

broke down" below, but rather makes these arguments for the first time on appeal. Appellee's Br. p. 28.

[32] "It is well settled that Indiana's appellate courts look with disfavor upon issues that are raised by a party for the first time on appeal … without first raising the issue at the first opportunity in the trial court." *State v. Peters*, 921 N.E.2d 861, 868 (Ind. Ct. App. 2010) (citing *Byrd v. State*, 592 N.E.2d 690, 691 (Ind. 1992)).

> More importantly, a trial court cannot be found to have erred as to an issue or argument that it never had an opportunity to consider. Accordingly, as a general rule, a party may not present an argument or issue on appeal unless the party raised that argument or issue before the trial court. *Marshall v. State*, 621 N.E.2d 308, 314 (Ind. 1993). In such circumstances the argument is waived. *Id.*

*Washington v. State*, 808 N.E.2d 617, 625 (Ind. 2004). Because Shorter did not raise his arguments relating to Indiana Code section 35-50-2-8(e) or the timing of the filing of the habitual-offender enhancement, these arguments are waived on appeal. *Id.* However, in his motion to dismiss filed before the trial court, Shorter did argue that the habitual-offender enhancement should be dismissed because it constituted "an unlawful double enhancement" under the Indiana Supreme Court's decision in *Dye v. State*, 972 N.E.2d 853 (Ind. 2012). Appellant's App. Vol. II p. 52. As this claim is properly preserved for appellate review, we will consider whether the trial court erred in denying Shorter's motion to dismiss on this ground.

## B. Alleged Double Enhancement

[33] Shorter argues that the trial court abused its discretion in applying both the habitual offender enhancement and the SVF firearm enhancement to his sentence for unlawful possession of a firearm, claiming that it is an impermissible double enhancement. "Claims of multiple sentencing enhancements are governed by statutory interpretation." *Woodruff v. State*, 80 N.E.3d 216, 217 (Ind. Ct. App. 2017). "We review matters of statutory interpretation de novo because they raise pure questions of law." *Id.*

[34] In *Shepherd v. State*, 985 N.E.2d 362 (Ind. Ct. App. 2013), we considered whether a defendant could have both a conviction enhanced due to the individual's status as an SVF and found to be a habitual offender in the same action. In that case, Shepherd challenged his conviction for unlawful possession of a firearm by an SVF and status as a habitual offender, arguing that in *Dye*, the Indiana Supreme Court held that an SVF cannot have his sentence enhanced under the general habitual-offender statute. *Shepherd*, 985 N.E.2d at 363. In rejecting Shepherd's challenge, we noted that on March 21, 2013, the Indiana Supreme Court issued its opinion on rehearing in *Dye*, clarifying that "an SVF conviction enhanced by an habitual offender adjudication is impermissible only when the same underlying offense, or an underlying offense within the res gestae of another underlying offense, is used to establish both the SVF status and the habitual offender status." *Id.* In affirming Shepherd's SVF conviction and habitual-offender status, we concluded that because the record demonstrated that Shepherd's SVF status

was based on a 1993 conviction for dealing in cocaine, as a Class B felony, while his habitual-offender enhancement was based on a 1991 Class C felony conviction for battery and a 2008 Class D felony conviction for intimidation, "[t]here is no reason for this court to believe that any one of those three underlying felonies is in any way related to another." *Id.* at 364.

[35] In denying Shorter's motion to dismiss the habitual-offender enhancement, the trial court found that

> Shorter's case is functionally indistinguishable from *Shepherd*, as his SVF charge and the habitual offender enhancement are founded on discrete, apparently unrelated felonies. The SVF charge against Shorter is premised on his 2012 conviction in cause 20D02-1102-FC-24 of Trafficking with an Inmate. In contrast, the predicate felonies supporting the habitual offender enhancement are Shorter's 2006 conviction of Unlawful Possession of a Firearm After a Previous Felony Conviction in cause 20D02-0603-FB-55 and his 2014 conviction of Failure to Return to Lawful Detention in cause 20D02-1802-FD-212. Thus, pursuant to *Dye* and *Shepherd*, the amended information does not subject him to an impermissible double enhancement by pairing the habitual offender enhancement with the SVF charge.

Appellant's App. Vol. II pp. 74–75. We agree with the trial court that Shorter's case is functionally indistinguishable from Shepherd. It is clear from the record that the SVF conviction and the habitual-offender enhancement were based on unrelated predicate felonies. As such, the trial court did not err in finding that Shorter could be found to be both an SVF and a habitual offender.

# Conclusion

[36] In sum, we conclude that (1) the trial court did not abuse its discretion in admitting the challenged evidence at trial, (2) the evidence is sufficient to sustain Shorter's convictions, and (3) the trial court did not err in denying Shorter's motion to dismiss the habitual-offender enhancement.

[37] The judgment of the trial court is affirmed.

Robb, J., and Altice, J., concur.